**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Patrick W. HANIGAN,
Defendant-Appellant.**

**No. 81–1262.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1982.

Decided July 19, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 22, 1982.

Alex A. Gaynes, Gaynes & Rockafellow, P.C., Tucson, Ariz., for defendant-appellant.

Frank D. Allen, Jr., Atty., Washington, D.C., for plaintiff-appellee.

Before ELY, SCHROEDER, and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge.

Patrick Hanigan appeals his conviction on three counts of aiding and abetting a robbery affecting commerce in violation of the Hobbs Act, 18 U.S.C. § 1951. His principal challenge is to the district court's jurisdiction to try him under that Act. He also contends that several evidentiary rulings by the district court were prejudicial, that his prosecution violated the double jeopardy clause of the Constitution, and that the pretrial identification procedure was impermissibly suggestive. We affirm the conviction.

## FACTS

On August 18, 1976, three undocumented Mexican aliens entered the United States

near Douglas, Arizona. The government's evidence showed that the men had previously entered this country and had found work as unskilled laborers in agricultural enterprises. On this occasion each had again crossed the border in search of agricultural work.

Defendant's brother Thomas found the men on Hanigan land and forced them to accompany him to the family ranch house, where he was joined by his father, George Hanigan, and the defendant Patrick. Over the course of several hours, the victims were brutally tortured and robbed of their few possessions. They were then told to run for the border; shotguns and pistols were fired at their backs, and two of the three sustained numerous pellet wounds.

All three Hanigans were charged in state court with various crimes, including assault, kidnapping and robbery. George Hanigan died before trial on those charges; Thomas and Patrick were acquitted on all counts. The brothers were later indicted on federal charges on October 10, 1979. The indictment charged them with robberies affecting commerce in violation of the Hobbs Act, 18 U.S.C. § 1951.

A first trial on these charges began in June, 1980, but the district court declared a mistrial when the jury was unable to reach a verdict. The second trial began on January 20, 1981. The district court ordered that separate juries hear the case because the government intended to offer evidence of an incriminating statement by Patrick which was not admissible against Thomas. Thomas was acquitted and Patrick was convicted on all three counts. The district court sentenced Hanigan to three years imprisonment on each count, the sentences to run concurrently.

## Hobbs Act Jurisdiction

The Hobbs Act [1] makes it a federal crime to obstruct, delay, or affect commerce "or the movement of any article or commodity in commerce, by robbery . . . ." 18 U.S.C. § 1951(a). As defined in the Act, commerce includes "all commerce between any point in a State . . . and any point outside thereof; . . . and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(b)(3).

As a jurisdictional predicate for this prosecution, the government has maintained and the indictment alleged that by crossing into Arizona to search for work, the victims were directly involved in "commerce" and thus fell within the ambit of the statute. Hanigan argues that labor (or laborers) cannot be considered an "article or commodity in commerce" within the meaning of the Hobbs Act. He also urges that if laborers are articles in commerce, undocumented alien laborers are not.

Thus the first issue we must address is whether the movement of laborers into this country is "commerce" within the scope of the Hobbs Act. Hanigan cites the exclusion of labor from the definition of "commerce"

1. In relevant part, the Act provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, . . . or of anyone in his company at the time of the taking or obtaining.

. . .

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or section 151–188 of Title 45.

in the antitrust laws. 15 U.S.C. § 17.[2] He argues that the reference in subsection (c) of the Hobbs Act to 15 U.S.C. § 17 means that labor is also excluded from Hobbs Act coverage. While 15 U.S.C. § 17 provides that "labor ... is not a commodity or article of commerce," the provision serves merely to exempt the activities of organized labor from the antitrust laws. *See Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 803–04, 65 S.Ct. 1533, 1537, 89 L.Ed. 1939 (1945); *California State Council of Carpenters v. Associated General Contractors, Inc.,* 648 F.2d 527, 532–36 (9th Cir. 1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 998, 71 L.Ed.2d 292 (1982); *Cordova v. Bache & Co.,* 321 F.Supp. 600, 605–13 (S.D. N.Y.1970). The Hobbs Act, on the other hand, does not except labor from the definition of "commerce." Subsection (c) of the Hobbs Act merely makes it clear that the inclusion of labor within the Act does not affect the operation of the antitrust or labor laws.

The Hobbs Act definition of commerce is coextensive with the constitutional definition. The purpose of the Act is "to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence." *United States v. Bagnariol,* 665 F.2d 877, 894 (9th Cir. 1981) (per curiam) (quoting *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)), *cert. denied,* —— U.S. ——, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1981); *see also United States v. Staszcuk,* 517 F.2d 53, 58–59 (7th Cir.) (en banc) ("purpose of the Hobbs Act parallels the central purpose of the Commerce Clause itself"), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). Thus, the only question is whether the movement of laborers may be regulated by Congress under the broad commerce power conferred by the constitution; whether labor also constitutes "commerce" for purposes of the antitrust laws is irrelevant.

The term "commerce" as used in the commerce clause, U.S.Const.art. I, § 8, means "intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 190, 6 L.Ed. 23 (1824). Such intercourse includes the movement of persons. *Edwards v. California,* 314 U.S. 160, 173–74, 62 S.Ct. 164, 166–67, 86 L.Ed. 119 (1941). For example, an ordinance requiring collection of a registration fee from all workers impedes the free flow of commerce by creating a burden on the movement of migrant labor. *Service Machine & Shipbuilding Corp. v. Edwards,* 617 F.2d 70, 76 (5th Cir. 1980).[3] The movement of laborers across state or national boundaries constitutes commerce within the meaning of the Hobbs Act. Accordingly, the district court correctly instructed the jury that labor or laborers could be articles of commerce.

Hanigan's second attack on jurisdiction is that the victims were not protected by the Hobbs Act because they had entered the United States illegally. He urges that the term "commerce" as used in the statute does not include commerce that Congress has made illegal.[4]

---

2. "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

3. *Cf. United States v. Pearson,* 508 F.2d 595 (5th Cir.), *cert. denied,* 423 U.S. 845, 96 S.Ct. 82, 46 L.Ed.2d 66 (1975) (jurisdiction upheld in Hobbs Act conspiracy prosecution where evidence showed that the victim hotel had a large number of out-of-state visitors).

4. For an alien to enter this country without inspection or to work in the United States without proper labor certification was declared illegal by Congress in the 1952 Immigration and Nationality Act. *See* 8 U.S.C. §§ 1251(a)(2), 1182(a)(14). Similarly, the Farm Labor Contractor Registration Act Amendments of 1974,

Hanigan points to nothing in the statute or legislative history, however, that would support his argument that "commerce" must be "legal" commerce.[5] The statute by its terms does not limit "commerce" to the flow of legally condoned articles. Nor could the commerce clause itself mean that an activity to be regulated by Congress must be legally permissible. It is anomalous to maintain that Congress could make undocumented entry into the United States—the movement of persons—unlawful, while at the same time maintaining that the same movement of persons is not "commerce over which the United States has jurisdiction"—the phrase which Congress used in the Hobbs Act. 18 U.S.C. § 1951(b)(3). Accordingly, we hold that the movement of undocumented alien laborers across a national boundary into this country is within the constitutional power of Congress to regulate, and thus constitutes commerce within the reach of the Hobbs Act.

Viewing the evidence in the light most favorable to the government, *United States v. Friedman*, 593 F.2d 109, 115 (9th Cir. 1979), it is uncontrovertible that defendant by robbery interfered with the victims' entry into the country and that the crimes prevented them from working as agricultural laborers in the United States. The government proved both a direct interference with and a potential threat to interstate commerce.[6]

### Evidentiary Rulings

Hanigan challenges several evidentiary rulings made by the district court. Each will be considered in turn. First, Hanigan contends that the district court erroneously excluded from evidence, on grounds of irrelevance, five photographs of a cattle-crossing culvert under a highway near the Hanigan ranch.[7]

The district court's rulings on the relevance of evidence will be overturned by this court only for an abuse of discretion. *United States v. Burreson*, 643 F.2d 1344, 1349 (9th Cir. 1981). "Evidence which is not relevant is not admissible." Fed.R. Evid. 402. Here, no evidence before the jury placed the victims at or near the culvert at any time. The photographs were therefore irrelevant and inadmissible. The district court properly excluded them from evidence.

---

Pub.L.No.93–518, 88 Stat. 1656 (codified in scattered sections of 7 U.S.C.), criminalized the knowing employment of aliens neither lawfully admitted for permanent residence nor authorized by the Attorney General to accept employment in this country. 7 U.S.C. § 2045(f).

5. The Seventh Circuit left open a related question in a case involving a corporate victim of an extortionate act. *United States v. Blakey*, 607 F.2d 779, 783 (7th Cir. 1979). Finding that the business in *Blakey* was a mixed legal and illegal business, the court stated that it was not considering whether the Hobbs Act applies to wholly illegal businesses, and held that the Hobbs Act's coverage does extend to mixed legal/illegal businesses.

6. Hanigan also argues that the government was required to prove an actual effect on commerce and that the jury was improperly instructed that a "potential" effect was sufficient to convict. All of the circuits which have considered the question have ruled that proof of a probable or potential effect is sufficient in attempt or conspiracy cases. *United States v. Jannotti*, 673 F.2d 578, 592 (3d Cir.) (en banc), *petition for cert. filed*, ⸱⸱⸱ U.S. ———, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Glynn*, 627 F.2d 39, 41 (7th Cir. 1980); *United States v.*

*DiGregorio*, 605 F.2d 1184, 1190 (1st Cir.), *cert. denied*, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). This rule derives from *United States v. Staszcuk*, 517 F.2d 53, 59–60 (7th Cir.) (en banc), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975), which involved a substantive Hobbs Act conviction. Writing for the majority of the court, Justice (then Judge) Stevens concluded that "the cases which uniformly hold that a threatened effect on interstate commerce is sufficient to bring the statute into play notwithstanding the absence of any actual effect, correctly interpret the congressional purpose." *Id.* at 59 (footnote omitted). *Glynn* has been cited with approval by this circuit, which follows the rule of the Seventh Circuit. *United States v. Bagnariol, supra*, 665 F.2d at 894.

In any event, we need not decide what sort of attenuated or potential effect on commerce is required to satisfy the jurisdictional aspect of the Hobbs Act as the government demonstrated an actual effect in this case.

7. The court did permit Hanigan to introduce 19 photographs of the ranch and the field where the victims claimed to have been tortured and robbed.

Hanigan's second assignment of error concerns the trial testimony of Connie Wright, a waitress at a Douglas coffee shop, who had not testified at the first federal trial. She testified at the second trial that shortly after the incident she overheard Hanigan say to his companions in the restaurant, "[w]e fixed those son-of-a-bitching wetbacks." Hanigan contends that this evidence should have been excluded because his defense counsel was not notified until mid-trial of Wright's proposed testimony.

■ Hanigan does not argue that the evidence was inadmissible, but rather that it was uncovered so late that he was "unfairly surprised." The record does not establish any prejudicial surprise. The government gave defense counsel the witness's statement as soon as it became available, and the district court held a preliminary conference at which it ruled that much of Wright's proposed testimony would not be permitted. Moreover, Hanigan's own argument to this court establishes that he vigorously attacked Wright's credibility. Hanigan was also able to offer the testimony of Bonnie Meyers and Ruby Hall, cashiers at the restaurant where Hanigan's alleged admission occurred. Although Wright stated at trial that she related Hanigan's statement to one of the other women, both testified to the contrary. Since the district court found that the government acted in good faith, and no specific prejudice has been shown, Hanigan has failed to demonstrate error in permitting the testimony of witness Wright.

■ Finally, Hanigan argues that the district court erred in permitting the government to introduce into evidence empty .357 Magnum shell casings found at the scene of the crime. Foundation for the introduction of the shells had been properly laid by testimony that defendant fired a revolver during the robbery and that he owned a .357 Magnum revolver. The evidence was therefore relevant and admissible, and the contention that it should have been excluded is without merit.

*Double Jeopardy*

Prior to the first federal trial, the defendants moved to dismiss the indictment on several grounds, including double jeopardy. After the district court denied this motion, defendants appealed to this court, which summarily affirmed the district court's ruling that they were not being subjected to double jeopardy, citing *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (successive prosecutions by different sovereigns do not violate double jeopardy), and *United States v. Solano*, 605 F.2d 1141 (9th Cir. 1979) (same), *cert. denied*, 444 U.S. 1020, 100 S.Ct. 677, 62 L.Ed.2d 652 (1980). *Hanigan v. United States*, No. 79–1823 (9th Cir. Jan. 29, 1980), *cert. denied*, 450 U.S. 982, 101 S.Ct. 1517, 67 L.Ed.2d 817 (1981). Hanigan offers no basis for departing from that result now.

■ Hanigan's argument that the government was equitably estopped to try him following the district court's declaration of a mistrial is also without merit. Hanigan has not pointed to any material misstatement made by the government upon which he reasonably relied to his detriment. *See, e.g., Broussard v. Patton*, 466 F.2d 816, 819–20 (9th Cir. 1972), *cert. denied*, 410 U.S. 942, 93 S.Ct. 1364, 35 L.Ed.2d 609 (1973). Moreover, Hanigan does not contend that the district court abused its discretion in declaring the mistrial. *See United States v. Cawley*, 630 F.2d 1345, 1349 (9th Cir. 1980); *United States v. Berniker*, 439 F.2d 686, 687 (9th Cir.), *cert. denied*, 404 U.S. 938, 92 S.Ct. 277, 30 L.Ed.2d 250 (1971).

*Pretrial Photo Identification*

All three victims identified Thomas and Patrick Hanigan at trial as the persons who robbed and tortured them. Additionally, over the objection of Patrick Hanigan's counsel, the district court permitted testimony that two of the victims positively identified the defendants the day after the incident, while the other victim made a tentative identification. Each victim picked out pictures of the brothers from

high school yearbooks. Hanigan contends that this procedure was impermissibly suggestive because his name appears under his picture in the 1972 yearbook, and the victims (who were illiterate) might have learned the name "Hanigan" from the sign located in front of the ranch where they were taken during the crime.

 A photographic procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), violates the defendant's right to due process. Identification procedures that emphasize a single individual's photograph may be unduly suggestive. *Id.* at 383, 88 S.Ct. at 970. However, because "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), a suggestive identification procedure will not be held to violate due process if sufficient indicia of reliability are present. *Id.* at 106, 97 S.Ct. at 2248. Five factors are to be considered in determining whether an out-of-court identification is reliable:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Green v. Loggins*, 614 F.2d 219, 223 (9th Cir. 1980). After examining the five factors, a court should weigh "their existence and extent '[a]gainst ... the corrupting effect of the suggestive identification itself.'" *United States v. Field*, 625 F.2d 862, 866 (9th Cir. 1980) (quoting *Manson, supra*, 432 U.S. at 114, 97 S.Ct. at 2253).

 Sufficient indicia of reliability are present here. The victims were held by their assailants for several hours during the middle of the day; the identification in question was made the following day; and

two of the victims were positive in their identifications. Assuming for the purpose of argument the procedure used was suggestive, the reliability of the identification was sufficiently indicated. This conclusion is supported by weighing the five factors against the corrupting effect of any suggestiveness. It can be said that the identification was "the product of observations at the time of the crime" rather than the result of "impressions made during the suggestive pretrial photographic identification process." *United States v. Field, supra*, 625 F.2d at 866.

Hanigan's other arguments to the effect that he was denied due process throughout the proceedings do not merit discussion in this opinion and are rejected.

Affirmed.