**Michael Lee PONCE,
Petitioner-Appellant,**

v.

**Hoyt C. CUPP, Superintendent, Oregon
State Penitentiary,
Respondent-Appellee.**

**Larry Wayne KEY, Plaintiff-Appellant,**

v.

**Hoyt C. CUPP, et al.,
Defendant-Appellee.**

**Nos. 83–3855, 83–3911.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 3, 1984.

Decided May 14, 1984.

Kenneth Lerner, Lawrence Matasar, Hoffman, Slader & Matasar, Portland, Or., for Ponce and Key.

David L. Hattrick, Deputy Atty. Gen., Portland, Or., for Cupp.

* Honorable Walter Early Craig, United States District Judge, District of Arizona, sitting by

Before WALLACE and CANBY, Circuit Judges, and CRAIG,* District Judge.

WALLACE, Circuit Judge:

Ponce and Key appeal from the district court's denial of writs of habeas corpus. We have jurisdiction under 28 U.S.C. §§ 1291, 2253, and affirm the district court.

I

Early one summer evening, while still light, a black four-door car stopped near Jantzen Beach, Oregon to pick up a hitch-hiker. The hitchhiker, a sixteen year old high school student named Farnsworth, got in the back seat behind the driver. A German Shepherd puppy and another man sat next to the driver. In the back seat to the right of Farnsworth sprawled a third man, apparently asleep.

The driver turned around and asked Farnsworth if he wanted a ride. Soon after the car pulled away, Farnsworth reached over the front seat to pet the puppy. The front seat passenger warned him not to, and Farnsworth sat back. Then the front seat passenger pulled out a knife, pointed it at Farnsworth and began asking him if he wanted to die. He then reached out, pinned Farnsworth against the back seat, and, staring him straight in the face, put the knife to his throat for about a minute. Farnsworth asked to be let out of the automobile. Both the driver and the front seat passenger reacted strongly, saying he would be lucky to leave the car alive. They did not stop, although Farnsworth repeated his plea.

Subsequently, the front seat passenger reached back, slashing Farnsworth across the cheek with the knife. Several times the driver made eye contact with Farnsworth in the rear view mirror or turned his head to glance back at him. The driver

designation.

asked him if he wanted to die and, then asked him if he "gave good head." The front seat passenger then pointed his knife at Farnsworth and motioned that he fellate the back seat passenger. Although the front seat passenger repeated his threat, neither Farnsworth nor the other rear seat passenger responded. The front seat passenger then told Farnsworth to hand over what he had in his pockets. Farnsworth gave him a hashish pipe and a roach clip. The driver said to check for money, so Farnsworth gave the front seat passenger his wallet. After finding no money, the front seat passenger returned the wallet, and threatened to have sexual intercourse with Farnsworth. Thereafter, the driver stopped the car and ordered Farnsworth out.

Farnsworth ran to a service station and called the state police. He gave a detailed description of the car, some of its contents (including a knapsack), the driver, and the front seat passenger. Soon after the state police broadcast the descriptions, a trooper stopped a black four-door car with a driver and passengers who matched those descriptions. The trooper arrested the passengers.

Later that evening, the police called Farnsworth to the station to look at some suspects picked up in a black car with a dog and knapsack. Farnsworth stood in a hallway while the police placed a one-way mirror in front of the opened door of a holding room. He did not recognize the two men in this first room, so the police repeated the procedure with three more rooms. In a second room, Farnsworth positively identified the front seat passenger who had cut him. The passenger was resisting the police's efforts to show his face. This was Key. In a third room, Farnsworth positively identified the back seat passenger. In a fourth room, Farnsworth positively identified the driver. The driver was struggling with officers in the holding room and shouting "I have fifteen brothers that will kill you." This was Ponce.

Oregon prosecuted and convicted Ponce and Key in separate trials. The state court of appeals, however, reversed and remanded, finding the stop leading to their arrests unlawful. *See State v. Key*, 44 Or.App. 79, 604 P.2d 1286 (1980); *State v. Ponce*, 43 Or.App. 665, 603 P.2d 1243 (1979). On remand, they were again convicted. In Ponce's trial, the state court permitted testimony that Farnsworth identified Ponce at the police station, and allowed Farnsworth to make an in-court identification. In Key's trial, the state court allowed only an in-court identification.

After exhausting their state remedies, *see State v. Ponce*, 54 Or.App. 581, 635 P.2d 1042 (1981), *rev. denied*, 292 Or. 568, 644 P.2d 1129 (1982); *State v. Key*, 54 Or.App. 575, 635 P.2d 1039 (1981), *rev. denied*, 292 Or. 568, 644 P.2d 1129 (1982), Ponce and Key sought writs of habeas corpus in federal district court. Ponce argued that the state court unlawfully refused to suppress the showup and in-court identifications. Key argued the state court unlawfully refused to suppress the in-court identification. The district court denied the writs, and Ponce and Key appealed.

## II

■ Both Ponce and Key argue Farnsworth's pretrial and in-court identifications of them resulted from an illegal stop and required suppression of all identifications as tainted fruits of that stop. As the district court found and our independent review of the trial record indicates, Oregon provided Ponce and Key with a full and fair opportunity to litigate their fourth amendment claims to suppress all identifications in state court. Among other things, the Oregon courts recognized and applied the controlling legal precedent of *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (*Crews*). *See State v. Ponce*, 54 Or.App. at 583–84, 635 P.2d at 1044–45; *State v. Key*, 54 Or.App. at 576, 635 P.2d at 1040. Under these circumstances "the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his

trial." *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976). Therefore, we do not reach Ponce's and Key's fourth amendment arguments.

### III

■ Ponce next argues the showup procedure used by the police violated his due process rights. The leading case on this subject remains *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (*Biggers*). *See also Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (*Manson*). Under *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982), we freely review as a mixed question of law and fact whether the pretrial identification procedures used violated the Constitution. *See also United States v. McConney,* 728 F.2d 1195, 1202, 1205 (9th Cir.1984) (en banc). The questions of fact underlying this conclusion, however, remain subject to a rebuttable presumption of the state court's correctness. *See Sumner v. Mata,* 455 U.S. at 597, 102 S.Ct. at 1306; *Bashor v. Risley,* 730 F.2d 1228 at 1232 (9th Cir.1984); 28 U.S.C. § 2254(d).

In reviewing the admission into evidence of pretrial identification in *Biggers,* the Supreme Court set out five factors to consider in asking whether, under the totality of the circumstances, the identification remained reliable despite the suggestive pretrial procedure. *Biggers,* 409 U.S. at 199–200, 93 S.Ct. at 382. They included: the witness' opportunity to view the criminal during the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the witness' level of certainty at the identification confrontation, and the length of time between the crime and the confrontation. *Id.*

As we recognized in *Green v. Loggins,* 614 F.2d 219, 223 (9th Cir.1980), *Biggers* implies a two-step test: first, whether the identification procedure was unnecessarily suggestive; and second, whether the identification was nonetheless reliable. Assuming that the identification procedure in this case was unnecessarily suggestive, *see*

*State v. Ponce,* 54 Or.App. at 589, 635 P.2d at 1047; *see also Manson,* 432 U.S. at 111, 97 S.Ct. at 2251; *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983); *cf. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381 (showups do not necessarily violate due process); *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), we find the identification nonetheless reliable under *Biggers.*

■ Each of the five *Biggers* factors supports the conclusion by the state court of admissibility. Despite Ponce's contention to the contrary, the record supports the state court's finding that Farnsworth had various full and partial views of Ponce's face during his half hour in the car. Farnsworth had a good opportunity, under reasonable lighting, to view the criminal.

Like the victim in *Biggers,* Farnsworth was "no casual observer" to the crimes involving him. His attention naturally focused on his captors, and more than once Ponce invited further attention by threatening Farnsworth. Although Ponce argues the phenomenon of "weapon focus" may have reduced Farnsworth's attention to other details, Ponce has forgotten that Key did not produce a weapon until after Farnsworth had viewed and heard Ponce, and that Farnsworth, feeling threatened by both Ponce and Key, watched both of them even after Key pulled the knife. Farnsworth paid a high degree of attention to the criminal.

After escaping from the car, Farnsworth gave the state police a "very specific" description of his captors and the car. The state court found Farnsworth's first description of the driver was

a white male adult, approximately 30, curly brown hair past the shoulders, had a mustache, a straggly beard, at the time, five-foot ten to five-foot eleven, approximately 140 pounds, mustache, T-shirt ... a black shirt here with blue jeans and a gold earring in one of the ears.

*State v. Ponce*, 54 Or.App. at 590, 635 P.2d at 1047. This description equals in detail the description given in *Biggers, see* 409 U.S. at 200, 93 S.Ct. at 382, and closely matched the appearance of Ponce at the time of his arrest, *see State v. Ponce*, 54 Or.App. at 587, 635 P.2d at 1045. Farnsworth thus gave an accurate prior description of the criminal.

At the showup, Farnsworth had no hesitation in positively identifying Ponce as the driver. *See State v. Ponce*, 54 Or.App. at 590, 635 P.2d at 1047. He did not, despite the suggestiveness of the procedure, ponder an identification of the two suspects he had never seen, *cf. Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 (reliability shown by the witness' continued resistance to identifying suspects she had never before seen), and, although he once later confused the rooms in which the police held Ponce and Key, he did not confuse the two suspects' roles as driver and passenger. Farnsworth exhibited a high level of certainty at the identification confrontation.

As to the last factor of the *Biggers* test, the police held the showup less than five hours after the crimes, a shorter lapse than the questionable seven months in *Biggers, see id.*, or even the unobjectionable two days in *Manson, see* 432 U.S. at 116, 97 S.Ct. at 2253.

Each of the five factors from *Biggers* indicates the reliability of Farnsworth's identification. The state court, using "independent source" language, reached the same conclusions of mixed law and fact under a state law version of the *Biggers* factors. *See State v. Ponce*, 54 Or.App. at 589–90, 635 P.2d at 1046–47, *citing State v. Classen*, 285 Or. 221, 590 P.2d 1198 (1979). Weighing the *Biggers* factors against the "corrupting effect" of the suggestive showup and police comments about the suspects, *see Manson*, 432 U.S. at 114, 97 S.Ct. at 2253; *United States v. Field*, 625 F.2d 862, 866 (9th Cir.1980), we find no substantial likelihood of misidentification, *see Biggers*, 409 U.S. at 201, 93 S.Ct. at 383; *see also, e.g., Manson*, 432 U.S. at 116, 97 S.Ct. at 2253; *Simmons v. United States*, 390

U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Hanigan*, 681 F.2d at 1133. The state court properly admitted evidence of Farnsworth's pretrial identification of Ponce.

IV

Both Ponce and Key argue the suggestive pretrial identifications tainted Farnsworth's subsequent in-court identifications of them. To the extent they, and particularly Key, base their arguments on *Crews*, they seek to relitigate fourth amendment claims fully and fairly litigated in the Oregon courts. The Supreme Court in *Crews* did address the question of the witness' reliable independent identification of the criminal and observed that, the other conditions of *Crews* satisfied, reliability would not always placate the Court's concerns about official exploitation of wrongful conduct in the fourth amendment area. 445 U.S. at 473 n. 19, 100 S.Ct. at 1251 n. 19. This analysis aims only at fourth amendment violations, however. As held earlier, we will not entertain Ponce's or Key's fourth amendment arguments. The Oregon courts have already done so. *See generally Stone v. Powell*, 428 U.S. at 482, 96 S.Ct. at 3046.

To the extent Ponce and Key argue Farnsworth's in-court identifications of them violated fourteenth amendment due process, we analyze their claims under *Biggers. See Manson*, 432 U.S. at 106 n. 9, 97 S.Ct. at 2249 n. 9; *United States v. Hammond*, 666 F.2d 435, 439 (9th Cir.1982). In Key's case Oregon apparently suppressed the pretrial identification on fourth amendment grounds. We assume that any corrupting effect on the subsequent in-court identification would be, however, the same as in Ponce's case.

The *Biggers* test focuses on admissibility. Undoubtedly the "reliability of an in-court identification is the linchpin in determining its admissibility," *United States v. Barrett*, 703 F.2d 1076, 1085 (9th Cir.1983) (*Barrett*), but our *Biggers* analysis measures directly only the reliability of a pretrial identification. For example, in *Bar-*

*rett* we made it clear that the level of certainty measured was the certainty of the pretrial identification, not the disputed in-court identification, and the length of time measured was the time elapsed before the pretrial identification, not the in-court identification. *See* 703 F.2d at 1085; *accord, e.g., United States v. Burnette*, 698 F.2d 1038, 1045–46 (9th Cir.), *cert. denied,* — U.S. ——, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983); *United States v. Barron*, 575 F.2d 752, 754 (9th Cir.1978). However, as we stated in *United States v. Field,* 625 F.2d 862, 868 n. 2 (9th Cir.1980):

> A reviewing court must consider "the witness' level of certainty *at the prior confrontation* ...." ... Although a witness' certainty at trial is undoubtedly significant, it is primarily a matter for the jury. The level of certainty at the pretrial confrontation, however, may well be probative of the reliability of a witness' subsequent in-court identification and the degree of influence had by the suggestive pretrial procedure.

(emphasis in original), *quoting United States v. Barron*, 575 F.2d at 754. Thus, in these circumstances the admissibility of the in-court identification under *Biggers* depends largely on analysis of the pretrial identification.

■ Without unnecessarily repeating the detail in our earlier analysis of Farnsworth's pretrial identification of Ponce, we find Farnsworth had a good opportunity to view Ponce, and an even better opportunity to view Key. Farnsworth paid close attention to Ponce several times, and even closer attention to Key. Farnsworth accurately described Ponce, and gave a similarly detailed description of Key. Farnsworth, although later uncertain about the order of identification, positively identified Ponce at the showup, and identified Key with equal certainty. Finally, less than five hours elapsed between the crime and the time Farnsworth confronted Ponce and Key at the showup. Weighing these five strong indicia of reliability against the suggestiveness of the showup, police comments before the showup, and the suspect's actions during the showup, we conclude that Farnsworth's in-court identifications remained sufficiently reliable to justify their admission into evidence. It was then for the trier of fact to make the final determination of believability.

We observe also that the Oregon courts found, at least partly as a matter of fact, that Farnsworth had an independent basis for his in-court identifications of Ponce and Key wholly apart from the showup. *See, e.g., State v. Ponce*, 54 Or.App. at 590, 635 P.2d at 1047. From our *Biggers* analysis we agree: Farnsworth's in-court identifications of Ponce and Key were " 'the product of observations at the time of the crime' rather than the result of 'impressions made during the suggestive pretrial ... identification process.' " *United States v. Valenzuela*, 722 F.2d 1431, 1432 (9th Cir.1983), *quoting United States v. Hanigan*, 681 F.2d at 1133, *and United States v. Field,* 625 F.2d at 866. The admission of those identifications did not violate due process.

AFFIRMED.