**Raul RAMIREZ, Plaintiff,**

**v.**

**COUNTY OF LOS ANGELES, et al., Defendants.**

**No. CV 04–6102GAFFMOX.**

United States District Court, C.D. California.

Oct. 25, 2005.

---

Michael Olecki, Grodsky & Olecki, Santa Monica, CA, for plaintiff.

Patrick L. Hurley, Manning & Marder, Kass, Ellrod & Ramirez, Los Angeles, CA, for Defendants.

## MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

FEESS, District Judge.

## I.

## INTRODUCTION

In May 2002, at about 5:45 a.m., a male hispanic driving a small, blue compact car forced a sixteen year old girl into his car, drove away with her and attempted to sexually assault her in the vehicle. Not long after she was abducted, she managed to escape and run to safety. A back pack, containing her school books and other items, was left in the car. It was located about 45 minutes later at a location approximately four miles from the location of her escape. The victim was interviewed by Los Angeles Sheriff's Deputies, but no suspect was identified and no arrests were made.

Eight months later, Los Angeles Sheriff's Det. Frank Bravo arrested Plaintiff Raul Ramirez for the kidnaping and as-

sault. After ten months in jail, Ramirez came to trial, was acquitted by the jury, and was found factually innocent by the trial judge. Ramirez then filed this suit against Det. Bravo and the County of Los Angeles for false arrest and related Fourth and Fourteenth Amendment violations.

Det. Bravo now moves for summary judgment asserting qualified immunity, the doctrine that immunizes law enforcement officers from civil suits where their conduct did not violate a constitutional right that was clearly established at the time of the events giving rise to the lawsuit. Under controlling Supreme Court precedent, a Court confronted with a motion asserting qualified immunity must: (1) determine whether, drawing all reasonable inferences in favor of the party claiming injury, a constitutional right was violated, and, if so; (2) determine whether the right was clearly established at the time. *Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Here Det. Bravo asserts that Plaintiff cannot meet the first element of that test because the victim identified Ramirez as her kidnapper and identified his car as the one in which she was abducted. According to Det. Bravo, he therefore had probable cause to arrest Ramirez for kidnaping and sexual assault and to conduct searches relating to those criminal violations.

The facts, however, are not so simple and clear cut, and are susceptible to a radically different characterization, which undoubtedly contributed to Ramirez's acquittal and the trial judge's finding of factual innocence. Viewed in a light most favorable to Ramirez who asserts the constitutional injury, the record contains evidence from which a trier of fact could conclude that Det. Bravo consciously disregarded substantial evidence that placed the victim's description of Ramirez in seri-

ous doubt. From that evidence, a jury could conclude that Det. Bravo knew he did not have probable cause to arrest Ramirez, but took him into custody anyway because he believed that he could extract a confession from him once he was in custody. A jury might conclude that, when that effort failed, Det. Bravo sought to manipulate the criminal justice system, through, among other things, preparing false police reports, to insure that the District Attorney pursued the case against Ramirez. A jury that reached such conclusions would be supported by evidence that:

(1) before he arrested Ramirez, Det. Bravo knew of but ignored significant discrepancies between the victim's description of her assailant and Ramirez's appearance before arresting Ramirez;

(2) before he arrested Ramirez, Det. Bravo knew of but ignored significant discrepancies between the victim's description of her assailant's car and the car driven by Ramirez;

(3) Det. Bravo manipulated the victim's review of a photographic lineup to encourage her to identify Ramirez as the assailant;

(4) Det. Bravo was aware of the distinct possibility that the victim's identification of Ramirez as the assailant was tainted by her observations of Ramirez on multiple occasions between May 2002 and January 2003 driving a blue Honda Accord;

(5) Det. Bravo ignored evidence regarding the time and location of the victim's backpack, some significant distance from the site of the abduction and the location of her escape;

(6) Det. Bravo applied for and obtained a search warrant for Ramirez's residence based on his affidavit that contained material misstatements and omissions of material fact;

(7) Det. Bravo attempted to coerce Ramirez into confessing, threatening that he would be placed in the general population at the county jail, and threatened to "go after" Ramirez's brother, who is an LAPD officer;

(8) Det. Bravo in fact lodged a complaint against Ramirez's brother with the Internal Affairs Division of the Los Angeles Police Department, and did so in the hope that it would place pressure on Ramirez to confess;

(9) Det. Bravo prepared a falsified police report indicating that the victim had initially stated that her assailant (like Ramirez) had a mole on his right cheek, when, in fact, she had never made such a statement;

(10) Det. Bravo personally participated in efforts, ultimately successful, to establish an extremely high bail—$5 million—for Ramirez even though he had no criminal record and had a substantial ties to the community.

Based on this evidence, the Court cannot say, as a matter of law, that no constitutional violation occurred. Moreover, the case does not present esoteric or arcane issues of constitutional law. No officer could reasonably conclude that the Constitution would permit: (1) disregarding evidence relevant to the identification of a suspect; (2) the manipulation of the identification to manufacture probable cause; (3) the presentation of false statements and the omission of material information to obtain a search warrant; or (4) the presentation of falsified police reports to the District Attorney's Office to further the prosecution of a suspect. For these reasons, which are discussed in greater detail below, the motion for summary judgment on qualified immunity grounds as to claims brought under the Fourth and Fourteenth Amendments is **DENIED.**

Ramirez also asserts a Fourteenth Amendment claim that Det. Bravo concealed exculpatory evidence in violation of

**1214**

the rule in *Brady v. Maryland* and its progeny. However, while the evidence of the alleged *Brady* violation may be relevant to the illegal seizure claim, it fails to establish an independent claim because Plaintiff was acquitted. Likewise, the Eighth Amendment claim fails because Plaintiff has not established either that Det. Bravo had a duty that he violated or that he was subjected to "unnecessary and wanton infliction of pain . . . ." *Farmer v. Brennan,* 511 U.S. 825, 833–34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). As to these claims, the motion is **GRANTED** because Plaintiff has not established a Constitutional violation.

With respect to Ramirez's state law claims, the Court concludes that the record contains evidence that would establish each of the elements of his state law claims for false imprisonment and a violation of Civil Code Section 52.1 and that Det. Bravo should be estopped from asserting that the state law claims were not timely filed. Therefore, the motion as to those claims is **DENIED**.

Finally, with respect to the *Monell* claim against Los Angeles County, the motion is **GRANTED**. Plaintiff has presented no evidence that Det. Bravo's actions reflect any custom, policy, practice or procedure of Los Angeles County, and, indeed, the record contains evidence that Det. Bravo's violation of established policies and practices of the Sheriff's Department contributed to the Constitutional deprivations alleged in this case.

## II.

### STATEMENT OF FACTS

#### A. The Abduction of Mayra Perez

On May 16, 2002, while waiting for a bus, at approximately 5:45 a.m., Mayra Perez ("Perez"), a minor, was abducted at gunpoint by a man she first described to police only as a male Hispanic, 20–30 years old, clean shaven with a medium build and light complexion. (SGI ¶ 1; Bravo Decl. ¶¶ 2, 4). Perez reported that her abductor was driving a navy blue compact car similar to a Honda Civic, with blueish-gray interior, a black dashboard and tinted windows. (SGI ¶ 2; Bravo Decl., Ex. 4 [Bravo May 16th Report] at 43; Plf. Ex. 6 [Bravo Trial Trans.] at 109:2–17).

The kidnapper, who made no attempt to disguise his appearance, commanded Perez to get in his car and after she complied, made her put on a pair of sunglasses with masking tape on the lenses. (SGI ¶¶ 3, 5). Shortly thereafter, the kidnapper told Perez that he had raped other women and was taking her to a motel to rape her. (SGI ¶ 7). After ten to fifteen minutes of driving, the kidnapper stopped the car on the side of the road and demanded that Perez orally copulate him. (SGI ¶ 8). Perez refused and freed herself from the car, leaving her backpack behind. (SGI ¶ 10; RSGI ¶ 72). As Perez was making her escape, the kidnapper sprayed her in the face with pepper spray. (*Id.*).

#### B. Detective Bravo is Assigned to the Case

Perez ran to a nearby apartment and phoned 911. (RSGI ¶ 75; Plf. Ex. 1 [911 trans.] at 28). When asked for a description of her kidnapper, she replied: "I can't even see at him cause he made me put some glasses on and they were taped." (SGI ¶ 75). Within two hours, Det. Bravo of LASD was assigned to the case. (SGI ¶¶ 11, 76). Det. Bravo interviewed Perez that morning. (SGI ¶ 11; RSGI ¶ 76). His initial notes reflected that the victim's general description of the kidnapper was devoid of any reference to unique features. (RSGI ¶ 77; Plf. Ex. 14 [Bravo's 5/16/2002 notes] at 184).

While Perez was at the station with Det. Bravo, deputies showed up with her back-

pack. (Plf. Ex. 5 [Perez Depo.] at 75:7–12). The backpack had been found around 6:30 a.m. by the owner of a shop located roughly four miles northwest of where she escaped. (SGI ¶ 153; Plf. Ex. 22 [Hernandez Depo.] at 227:17–23, 230:17–19). It is undisputed that the backpack was dusted for fingerprints (Plf. Ex. 22 [Hernandez Depo.] at 228:24–229:3) and that Plaintiff's fingerprints did not appear (Bravo Decl. ¶ 10), but the presence of any fingerprints is disputed—Perez testified that "good" fingerprints were found and Det. Bravo claimed none were found.[1] (Compare Plf. Ex. 5 [Perez Depo.] at 76:25–77:12 with Bravo Decl. ¶ 10).

After this initial interview, Det. Bravo took Perez to LASD headquarters where she was interviewed by forensic artist Sandra Enslow ("Enslow"), who produced a sketch from Perez's description. (SGI ¶¶ 11–12). At this interview, Perez now described her assailant as having a long, straight, pointed nose, a "butt chin," and a scar on his right cheek. (SGI ¶ 81; Plf. Ex. 3 [Enslow Depo.] at 55:14–58:18). Perez never mentioned a mole to Enslow, a fact of importance in this case. (SGI ¶ 88; Plf. Ex. 3 [Enslow Depo.] at 59:18–22). Perez's description was recorded in Enslow's notes and formulated into a sketch. (SGI ¶ 85; Plf. Ex. 3 [Enslow Depo.] at 60:3–16). Enslow has no specific memory of whether she handed over the notes to Det. Bravo that day, although she testifies that it is her habit to convey such interview notes to detectives along with her sketch. (Id.). Det. Bravo, however, claims he did not receive the notes that day and, in fact, was not aware that they existed until one week before trial in November 2003. (Bravo Decl. ¶¶ 9, 31).

### C. Det. Bravo's May 16th Report

In addition to the initial notes mentioned above, on May 16, 2002, Det. Bravo also wrote out an official Incident Report. (Bravo Decl., Ex. 4). In it, Det. Bravo again reported that Perez had described her assailant only in general terms "as a male Hispanic adult, 25–30 years old, medium build, light complexion, clean shaven and black hair." (Id. at 42–43). It, like the notes, did not report any unique features or identifiers such as a butt chin, moles, or a scar. (Id.). The description of the car was similar to that given in the initial notes. (Id.).

### D. The Events of January 10, 2003

Eight months later, on January 10, 2003, Perez's mother called Det. Bravo and reported that while she and Perez were driving, Perez saw her kidnapper driving the same car he drove on the day of her abduction and that they had written down the license plate number. (SGI ¶ 14). Perez had seen the car and driver several times before, on her way to school, but when her mother reported this to Det. Bravo after the first sighting, he informed her there was nothing he could do without a license plate number. (Plf. Ex. 5 [Perez Depo.] at 81:1–25, 83:22–25).

This time, plate number in hand, Det. Bravo ran it through the DMV database to find that they belonged to a blue Honda Accord registered to Plaintiff, a 25–year–old, special education teacher at a middle school located in the vicinity of Perez's abduction. (SGI ¶¶ 15, 73; Df. Ex. 4 [Bravo 1/11/2003 Report] at 56). The car had greyish cloth seats matching Perez's description, but lacked the black dashboard or tinted windows that Perez initially reported. (SGI ¶ 107).

---

1. Perez testified that she was present during the fingerprinting, that she asked Det. Bravo if they had gotten any good fingerprints, and that he replied that they had. (Plf. Ex. 5 [Perez Depo.] at 77:4–12).

### 1. The Photo Line–Up

Det. Bravo made arrangements to meet Perez and prepared a six-pack photo identification line-up using Plaintiff's DMV photo along with those of five other similar-looking Hispanic males. (SGI ¶ 16). Before the line-up, Perez read and signed a standard admonition form explaining that she should not guess and was not obligated to pick anyone from the photo array. (SGI ¶¶ 18–19).

There is conflicting testimony from Perez about her interactions with Det. Bravo during the photo line-up and the certainty with which she identified Plaintiff. At trial and in her deposition, she testified that Det. Bravo "told [her] to look at the pictures, and . . . to pick a guy out, a guy that I thought looked like the subject" (Plf. Ex. 5 [Perez Depo.] at 83:1–7), more specifically he said " 'Okay, look at these pictures,' and then said, 'Okay, I tell you what, the one you think it is, circle it and put your initial on it.' " (*Id.*, Ex. 4 [Perez Trial Trans.] at 63:6–9).

On the certainty of her identification, Perez states the following: "Q. Now, when you circled the picture, you were picking him as the person who was the most like the perpetrator; correct? A. The person that looked like him, yes," (Plf. Ex. 5 [Perez Depo.] at 85:13–16), and "Q. Now you remember saying that the person you picked out of the six pack was the person who most looked like the perpetrator? A. Yes, I remember saying that." (Plf. Ex. 5 [Perez Depo.] at 86:12–15). But she also says, "[w]ell it had been months. I mean, I couldn't really remember, but when I saw the picture, it kind of impacted me. I was like, Oh my gosh. That's him. That's the guy." (Plf. Ex. 5 [Perez Depo.] at 85:19–22).

It is undisputed, however, that it took approximately two minutes of examining the photos, for Perez to pick out Plaintiff. (SGI ¶ 17; Plf. Ex. 4 [Perez Trial Trans.] at 62:5–28, Ex. 5 [Perez Depo.] at 85:19–22). Det. Bravo then told Perez she had picked out the owner of the car. (Plf. Ex. 5 [Perez Depo.] at 84:14–18). Det. Bravo's affirmation of the identification directly conflicts with LASD policy because it provides confirmatory feedback that may be internalized by a witness. (SGI ¶ 97).

### 2. Det. Bravo Conducts Surveillance and Requests a Search Warrant

That same day, Det. Bravo conducted surveillance on the residence listed on Plaintiff's DMV registration. (SGI ¶ 20). Plaintiff arrived home at around 5:45 p.m. driving a blue Honda with a license plate that matched the one given to Det. Bravo by Perez and her mother. (SGI ¶ 21). On the basis of an affidavit filed by Det. Bravo, a judge then issued a search warrant for Plaintiff's home to be executed that night. (SGI ¶ 24).

Det. Bravo's affidavit contained at least three factual errors. (SGI ¶ 25). First it at least tripled the amount of time Perez spent in the kidnapper's car, putting it at 45–60 minutes instead of 10–15. (*Id.*). Second, Det. Bravo swore that Perez had not seen the driver of the blue Honda earlier that day, making it sound as if Perez had first identified the car and then, separately, picked out Plaintiff from the line-up based on her memory of the crime, when in fact she had seen the driver in the car that day. (*Id.*). Finally, Det. Bravo proclaimed that Perez "immediately picked S/Ramirez" out of the photo six pack, when in fact she had studied the photographs for two minutes before making an identification. (RSGI ¶ 110; Df. Ex. G [Bravo Warrant Aff.] at 65). The affidavit also failed to include several facts that might have argued against the issuance of a warrant such as the fact that Ramirez's photo did not match her previous descriptions of her assailant (lacking butt chin and scar), that

the car lacked two of the distinguishing characteristics described by Perez (black dashboard and tinted windows) and that Perez had repeatedly seen Ramirez driving in the car before she finally took down the license plate number.[2] (*See* Df. Ex. G [Bravo Warrant Aff.] ).

### 3. Sheriff's Deputies Arrest Plaintiff and Search his Home

Sheriffs deputies executed the search warrant that same night at the address listed on Plaintiff's DMV records, which turned out to be not only Plaintiff's residence, but that of his parents, brother, new wife, and other family members. (Plf. Ex. 9 [J. Ramirez Decl.] ¶ 2, Ex. 8 [R. Ramirez Decl.] ¶ 21). Plaintiff's brother, Jose Ramirez, is a Los Angeles Police Officer. (*Id.* ¶ 1).

From Plaintiff's car, deputies seized an opened box of condoms, petroleum jelly, and masking tape. (SGI ¶ 28). They also seized Jose Ramirez's old pepper spray holster (no pepper spray was found) and an entire gun safe containing his old service weapon. (SGI ¶ 28; Plf. Ex. 9 [J. Ramirez Decl.] ¶¶ 3–5). They seized the entire safe because Jose informed them it had been jammed for more than a year and would not open even after obtaining the factory codes. (*Id.* ¶¶ 3–4). LASD's failed efforts to open the safe at the station were video taped, but Det. Bravo's report turned over to the D.A., failed to disclose the video taping. (SGI ¶ 117).

### 4. Plaintiff's Interrogation

Meanwhile, Det. Bravo had Plaintiff taken to a police station for interrogation. (SGI ¶ 29). Predictably, there are differing accounts of the interrogation, which might have been eliminated or at least

mitigated had Det. Bravo used a tape recorder and conducted the interrogation with a partner. However, it is undisputed that Det. Bravo conducted the interrogation without a partner or a tape recorder, both of which acts violated LASD practices. (SGI ¶ 127).

Ramirez states that Det. Bravo attempted to force a confession by threatening to physically harm him, telling him that he would likely be assaulted in jail, and threatening to "go after" his brother Jose. (Plf. Ex. 8 [R. Ramirez Decl.] ¶¶ 11–14). Det. Bravo denies these claims. (Bravo Decl. ¶ 25). Plaintiff adamantly denied having been involved in the crime and offered to take a DNA test. (SGI ¶ 12, RSGI ¶ 123). No such tests were administered, however.

### E. Det. Bravo's Supplemental Report

The next day, Det. Bravo filed a written supplement to his May 16th report. (Bravo Decl., Ex. 4 [Bravo 1/11/2003 Supp. Report] ). In this supplement, Det. Bravo reported, now having seen Plaintiff, that Perez *initially* described her abductor as having "a mole on the right side of his face" even though neither his notes nor his May 16th report, or Enslow's notes for that matter, make any reference to moles. (*Id.* at 55). Plaintiff does have a mole on his face; in fact, he has approximately 42 moles on his face and neck. (SGI ¶ 89).

The report also omitted any mention of features Perez described to Enslow, such as his "butt chin" and "scar," or the composite sketch showing such (although it included the sketch and the photo six pack as attachments), and failed to discuss Perez's other sightings of Plaintiff's car in the months before she delivered the license

---

2. While the affidavit noted that Perez had seen the car several times before, it neglected to mention that she had also seen the driver, creating the false impression that she had identified Ramirez only from her memory of the crime. (Df. Ex. G [Bravo Warrant Aff.] at 64).

number. (Bravo Decl., Ex. 4 [Bravo 1/11/2003 Supp. Report] at 65, 68). In reference to the photo line-up, this supplemental report, like the search affidavit, misreported that Perez had "immediately pointed at the photograph depicting Raul Ramirez" when in fact it had taken her at least two minutes. (*Id.* at 56).

Plaintiff also disputes several other claims in the report, such as Det. Bravo's assertion that Ramirez "stated his fingerprints were 'probably' on both the guns and mace/pepper spray" during the interrogation. (*Compare* Bravo Decl., Ex. 4 [Bravo 1/11/2003 Supp. Report] at 57 *with* R. Ramirez Decl. ¶¶ 16–17).

That same day, January 11, 2003, Det. Bravo again met with Perez. Det. Bravo showed her both Ramirez's booking photo and one of his car. (SGI ¶¶ 30, 100). Perez identified the car as that used by her kidnapper, but observed that Ramirez "had gained some weight." (SGI ¶ 100; Plf. Ex. 5 [Perez Depo.] at 92:8–24). Plaintiff, however, was not heavier in January than in May, but actually twenty pounds lighter, having lost the weight for his December wedding. (RSGI ¶ 101). Det. Bravo took no notes during this January 11, 2003 meeting and never informed Plaintiff of Perez's comments. (RSGI ¶¶ 103, 105).

### F. Meeting With Deputy District Attorney Rodriguez

After arresting Plaintiff, Det. Bravo referred the case to the district attorney's office for prosecution. Det. Bravo had an initial meeting with Deputy District Attorney ("DA") Victor Rodriguez ("Rodriguez") who would eventually charge Plaintiff. (SGI ¶ 31). Rodriguez is fairly certain that Perez was also present at that meeting, but he refused to state it conclusively because the file for the case which would have contained his notes on

the meeting have since been lost. (SGI ¶ 31). Both Det. Bravo and Perez claim Perez was present at this initial meeting. (Plf. Ex. 5 [Perez Depo.] at 89:22–90:25; Bravo Decl. ¶ 27).

Det. Bravo claims that at the meeting he provided Rodriguez with his initial May 16th incident report, the sketch, the search warrant and affidavit, the six-pack documents, his January 11th supplemental report, the results of the search of Plaintiff's residence and car, and some documents related to Plaintiff's criminal history[3] (Bravo Decl. ¶ 28), although Rodriguez has no memory of what was given to him and, as stated above, the file has been lost. (Plf. Ex. 10 [Rodriguez Depo.] at 129:16–18).

On January 14, 2003, Rodriguez charged plaintiff with four criminal counts including kidnaping for the purpose of sexual assault, criminal threats, use of tear gas as a weapon, and assault with a deadly weapon. (SGI ¶ 35).

### G. Plaintiff's Bail Hearing and Incarceration

Det. Bravo prepared a declaration for Plaintiff's bail hearing, which requested a $5 million bail; this is much higher than the normal amount. (Plf.Ex. 41). Det. Bravo claimed this amount was necessary because Plaintiff went to Mexico for 4–6 weeks bi-annually and was therefore a flight risk. (Plf.Ex. 41). Plaintiff claims this story was wholly fabricated. (Plf. Ex. 8 [R. Ramirez Decl.] ¶ 20). Later, after Plaintiff's bail amount was reduced, in an effort to re-raise the amount, Det. Bravo informed the court that Plaintiff had told him that his wife lived in Mexico and that Plaintiff went to Mexico every other month (Plf. Ex. 24 [5/22/03 Hearing Trans.] at 245), neither of which facts were true. (Plf. Ex. 8 [R. Ramirez Decl.] ¶ 21). Plain-

---

**3.** Plaintiff's criminal history apparently con- sisted only of a DUI. (SGI ¶ 32).

tiff was never able to meet bail and remained in jail through trial. (Plf. Ex. 8 [R. Ramirez Decl.] ¶ 4).

Upon taking Plaintiff to jail, Det. Bravo failed to inform the intake center that Plaintiff was an immediate family member of a police officer. (RSGI ¶¶ 141–146). This failure was in direct violation of policy established for the protection of such individuals. (*Id.*). Due to this failure, Plaintiff was initially housed in a segregated sex offender unit, instead of in the segregated unit for family members of law enforcement officers. (RSGI ¶ 180). Despite this protective custody, Plaintiff was urinated on by another inmate. (SGI ¶¶ 67–68). However, there is no allegation that this incident was tied in any way to the fact that he was the brother of a police officer. (*Id.*).

### *H. Preliminary Hearing, Trial Preparation and Trial*

On April 16, 2003, a preliminary hearing was held in Plaintiff's criminal case. At that hearing, Perez identified Plaintiff as the person who kidnapped and attempted to rape her. (SGI ¶ 39). Perez also testified, however, that her kidnapper had a "butt chin" and "froggy eyes," neither of which Plaintiff has. (SGI ¶ 40). In addition, she informed the court that after she had picked Plaintiff from the photographic line-up, Det. Bravo confirmed that the man she had picked out was the owner of the vehicle. (SGI ¶ 41). Despite this information, the court found the evidence sufficient to hold Plaintiff to answer for the charges. (SGI ¶ 42).

In early September 2003, Plaintiff's criminal defense attorney first informed the trial prosecutor, Deputy DA Mario Trujillo ("Trujillo") that he intended to present an alibi defense at trial and that ATM records showed Plaintiff using his ATM card at 6:42 a.m. on the morning of the kidnaping. (SGI ¶¶ 43–44). It was not until shortly after this communication that Trujillo turned over information regarding where and when Perez's backpack was found, despite the fact that both Det. Bravo and Trujillo were aware of the information months before. (Bravo Decl. ¶¶ 11–13). In addition, the sketch artist's notes describing the perpetrator as having a "butt chin" and a "scar" were not given to Plaintiff's criminal defense attorney until November 5, 2003, approximately one week before trial. (*Id.* ¶ 31).

At trial, Perez again identified Plaintiff as the person who kidnapped her. (SGI ¶ 71). Despite this identification, in November 2003, the court dismissed the assault with a deadly weapon charge at the close of the prosecution's case, and the jury ultimately found Plaintiff not guilty of the remaining charges. (SGI ¶¶ 57–58). The next month, the court granted Plaintiff's petition for a finding of factual innocence. (RSGI ¶ 160).

### *I. Plaintiff's Civil Actions*

Two months later, on January 8, 2004, Plaintiff filed a tort claim with the County of Los Angeles, which was denied two weeks later as untimely. (SGI ¶ 64). Plaintiff then filed an application for leave to file an untimely claim based on estoppel and excusable neglect which was denied, without prejudice, on December 10, 2004. (SGI ¶¶ 65–66).

Seven months later, in July 2004, Plaintiff brought the instant civil action against Det. Bravo, LASD and the County of Los Angeles (collectively "Defendants") alleging causes of action for 1) violations of Plaintiff's civil rights pursuant to 42 U.S.C. § 1983 (under several theories); 2) a *Monell* claim against the LASD and the County of Los Angeles; 3) false imprisonment; and 4) a violation of California Civil Code § 52.1.[4]

---

4. Plaintiff also brought claims for malicious prosecution and intentional infliction of emo-

Defendants now move the Court for summary judgment on these claims.

## III.

## DISCUSSION

### A. The Legal Standard for Summary Judgment

The Court assesses the motion under the usual summary judgment standard which permits entry of judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court must first decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the facts are not in dispute, then the Court determines whether the moving party is entitled to judgment as a matter of law. Further, where summary judgment is not proper on the entire claim, under Rule 56(d) the Court may grant partial summary judgment on discrete elements of the claim. Fed.R.Civ.P. 56(d); *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 (9th Cir.1981).

### B. Plaintiff's § 1983 Claims and Qualified Immunity

Det. Bravo claims that he is entitled to summary judgment on all of Plaintiff's constitutional claims due to qualified immunity.

#### 1. Legal Standard for Qualified Immunity

Qualified immunity protects government officials sued in their individual capacity from liability for their performance of discretionary official functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994); *Mabe v. San Bernardino County*, 237 F.3d 1101, 1107 (9th Cir.2001). In its most recent formulation of the doctrine, the United States Supreme Court held:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry. *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)....

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable.

*Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

Thus, to evaluate Det. Bravo's qualified immunity defense, the Court must first determine whether he violated Plaintiff's constitutional rights. Since this is Det. Bravo's motion for summary judgment, he

---

tional distress but voluntarily dismissed those

claims on April 14, 2005.

must show as a matter of law that no such violation occurred.

## 2. Plaintiff's § 1983 Claims

Section 1983 authorizes a court to grant relief when a party's federally protected rights have been violated by any individual acting under color of state law. A claim under the section consists of: 1) a violation of rights protected by the federal Constitution or created by federal statute or regulation; 2) proximately caused; 3) by the conduct of a "person;" 4) who acted "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. There is no dispute in this case that the last three elements are met, and thus the only inquiry is into the possible rights violations. Plaintiff bears the burden of establishing each element of the claim by a preponderance of the evidence. *See Larez v. Holcomb*, 16 F.3d 1513, 1517–18 (9th Cir.1994).

Plaintiff alleges several constitutional violations arising from his interactions with LASD, including unlawful search, false arrest, malicious prosecution, fabrication and withholding of evidence, failure to protect him while incarcerated, and *Monell* liability against LASD and LA County for all of these violations. The Court will address each in turn.

### a. Plaintiff's Unlawful Search Claim Based on Judicial Deception/*Franks v. Delaware*

Plaintiff contends that the search of his residence violated the Fourth Amendment because it was carried out pursuant to an illegally obtained warrant. Specifically, Plaintiff contends that Det. Bravo intentionally falsified and omitted material facts, which, if truthfully provided, would have defeated a probable cause determination by the magistrate, thus leading to a claim under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Det. Bravo claims qualified immunity.

### i. The Legal Standard

■ In *Liston v. County of Riverside*, the Ninth Circuit explained the availability of qualified immunity on judicial deception claims.

In *Branch v. Tunnell*, 937 F.2d 1382 (9th Cir.1991), we held that the standard for qualified immunity in a civil rights action of this type is governed by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978): "The *Franks* standard, although developed in a criminal context, 'also defines the scope of qualified immunity in civil rights actions.'" *Id.* at 1387 (quoting *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir.1991)). *Franks* established a criminal defendant's right to an evidentiary hearing when he made a showing of deliberate or reckless disregard for the truth in a search warrant affidavit and demonstrated that but for the dishonesty, the affidavit would not support a finding of probable cause. *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85.

Applying the standards set forth in *Franks*, we held in *Branch* that in a civil rights case where a claim of judicial deception is made, "if an officer 'submitted an affidavit that contained statements he knew to be false or would have known to be false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements, ... he cannot be said to have acted in a reasonable manner,' and the shield of qualified immunity is lost." *Branch*, 937 F.2d at 1387 (9th Cir.1991) (quoting *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir.1985)).

*Liston*, 120 F.3d at 972. Thus to survive summary judgment, Plaintiff must 1) "establish that, but for the dishonesty, the challenged action would not have oc-

curred;" and 2) "make a 'substantial showing' of deliberate falsehood or reckless disregard for the truth" on the part of the affiant. *Id.* at 973.

### ii. *"But For" Causation*

■ To determine but for causation, the Court must add the missing information to, and subtract the misrepresentations from, Det. Bravo's affidavit and determine if "what remains [is] sufficient to justify the issuance of the warrant." *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th Cir. 2005); *see also Liston*, 120 F.3d at 973 ("Whether the alleged judicial deception was brought about by material false statements or material omissions is of no consequence."); *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir.1992) ("Where … a warrant's validity is challenged for deliberate or reckless omissions of facts that tend to mislead, the affidavit must be considered with the omitted information included."). Probable cause to search exists where "there is a fair probability that contraband or evidence of a crime [would] be found in" Plaintiff's home. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). For the purposes of evaluating a judicial deception claim, this determination is to be made as a matter of law. *Liston*, 120 F.3d at 973.

■ The Court finds as a matter of law that Det. Bravo's misrepresentations and omissions taken together were material to the magistrate's determination of probable cause and had the statements been truthful and the omissions added, no probable cause would have existed. Here probable cause to search rested solely on Perez's identification of Plaintiff; the information falsified and omitted by Det. Bravo goes directly to the strength of that identification. As to the misstatements, Det. Bravo at least tripled the amount of time Perez spent in the kidnapper's car, putting it at 45–60 minutes instead of 10–15; proclaimed that Perez "immediately picked S/Ramirez" out of the photo six pack, when in fact it had taken her two minutes; and swore that Perez was unable to see the driver the day she called with the license plate number, making it sound as if Perez had first identified the car and then separately, picked out Plaintiff from the line-up based on her memory of the crime. Det. Bravo also omitted the fact that Ramirez's photo did not match Perez's previous descriptions of her assailant (lacking "butt" chin and scar), that the car lacked two of the distinguishing characteristics initially described by Perez (black dashboard and tinted windows) and that Perez had repeatedly seen Ramirez driving In the car before she finally took down the license plate number.[5]

With full and accurate disclosure, Det. Bravo would have been requesting a warrant to search the home of a man whom Perez had seen on multiple occasions on her way to school; who had 42 moles on his face, which Perez never mentioned seeing, and lacked the cleft or "butt" chin and scar she did describe; who she took a full two minutes to pick out when faced with an array of suspects; whose identification may have been tainted by Det. Bravo's suggestive comments; and whose non-distinctive blue Honda lacked the distinctive tinted windows and black dashboard Perez described the day of the crime. When factoring in the fact Perez spent only 10–15 minutes with her assailant during most of which she was forced to wear sunglasses with masking tape over the lens, it is clear that probable cause to search Plaintiff's

---

**5.** While the affidavit noted that Perez had seen the *car* several times before, it neglected to mention that she had also seen the *driver*, creating the false impression that she had identified Ramirez only from her memory of the crime. (Df. Ex. G [Bravo Warrant Aff.] at 64).

home did not exist based on her identification alone.[6] *See Grant v. City of Long Beach,* 315 F.3d at 1081, 1087 (9th Cir. 2002) (finding eyewitness identification inadequate where the victim identified the plaintiff "almost three months after the attempted break-in and after having tentatively identified another man."); *Bruning v. Pixler,* 949 F.2d 352, 359–60 (10th Cir. 1991) (denying qualified immunity on a *Franks* claim where the officer failed to include information in the arrest warrant affidavit regarding discrepancies in how the witness described the assailant's physical characteristics and the plaintiff's actual appearance); *Golino v. City of New Haven,* 950 F.2d 864, 867–68 (2d Cir.1991) (denying qualified immunity on a malicious prosecution claim where the officer had omitted from his warrant affidavit conflicting eyewitness descriptions, the fact that at least one eye witness positively identified another man, one eye witness gave conflicting stories, and that the fingerprints found at the scene of the crime did not match the plaintiff's).

### iii. Substantial Showing of Recklessness

■ On the second inquiry, a reasonable jury could determine that Detective Bravo acted with at least recklessness in filling out the affidavit, given the importance of Perez's identification to a probable cause determination and the number of misstatements and omissions. As the Court in *Liston,* 120 F.3d at 975, noted, "Given the importance of the For Sale/Sold signs to

the probable cause analysis, if [the affiant officer] observed the signs when he drove by the ... house, a jury could reasonably conclude that his failure to mention them in his affidavit amounted to at least reckless disregard for the truth." Accordingly, Det. Bravo is not entitled to qualified immunity on Plaintiff's *Franks v. Delaware* claim.

### b. False Arrest

■ Det. Bravo also claims qualified immunity on Plaintiff's false arrest claim. "The fourth amendment ... prohibits arrests without probable cause." *McKenzie v. Lamb,* 738 F.2d 1005, 1007 (9th Cir. 1984). "A police officer has probable cause to effect an arrest if 'at the moment the arrest was made .... the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." *Grant v. City of Long Beach,* 315 F.3d 1081, 1085 (9th Cir.2002) (quotations omitted). Accordingly, the first stage of the qualified immunity determination is whether Det. Bravo had probable cause to arrest Plaintiff.

Det. Bravo claims that probable cause was established by "Perez's unequivocal identification of plaintiff as the person who abducted her" (Mot. at 9) and that any inconsistencies in Perez's description and Plaintiff's appearance were "minor." (Reply at 8).[7] The analysis above, however,

---

6. This analysis is in line with the Ninth Circuit's articulation of the factors to be considered in determining whether an out-of-court identification is reliable in the context of impermissibly suggestive photo line-ups. Those factors include: 1) the opportunity to view the criminal at the time of the crime; 2) the degree of attention paid to the criminal; 3) the accuracy of the prior descriptions of the criminal; 4) the level of certainty demonstrated at the time of confrontation; and 5) the

length of time between the crime and the confrontation. *See United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir.1982).

7. Det. Bravo claims probable cause to arrest based solely on Perez's identification of Plaintiff *not* based on any items obtained during the search. (Mot. at 9). This may be because Plaintiff was arrested before the items were seized, but the evidence of timing is unclear. (*See* Bravo Decl. ¶ 23 ["I, along with several

shows that Perez's identification was anything but unequivocal, that the discrepancies were not minor, and that the record contains enough evidence that would support a conclusion that Det. Bravo manipulated the identification. Having already found that there was no probable cause to search Plaintiff's home for evidence of the crime, a fortiori, Det. Bravo lacked probable cause to actually arrest Plaintiff for that crime.

Further, Det. Bravo is not entitled to qualified immunity on the false arrest claim because a reasonable officer would have known that probable cause was lacking under such circumstances. *See Grant v. City of Long Beach*, 315 F.3d at 1081, 1087 (9th Cir.2002); *Bruning v. Pixler*, 949 F.2d 352, 359–60 (10th Cir.1991); *Golino v. City of New Haven*, 950 F.2d 864, 867–68 (2d Cir.1991). In fact, although the inquiry is an objective one, the fact that Det. Bravo omitted material facts and misstated information thereby strengthening Perez's identification, supports a conclusion that Det. Bravo himself realized that probable cause was lacking on its face.

### c. A Question of Fact Exists on Any Damages Limitation

In addition to his qualified immunity argument, Det. Bravo argues that even if Plaintiff is able to show that he was arrested without probable cause, his damages are necessarily limited to four days—the date of the arrest on January 10, 2003 until the date criminal charges were filed against him on January 14, 2003. (Mot. at 11 *citing Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.1981) (finding that a court erred in not finding that the filing of criminal charges by the district attorney insulated offending officers from liability for

damages suffered post charges)). However, questions of fact exist as to whether that damages limitation applies in this case.

■ While it is true that "[o]rdinarily, the decision to file a criminal complaint is presumed to result from an independent determination on the part of the prosecutor, and thus, precludes liability for those who participated in the investigation or filed a report that resulted in the initiation of proceedings," this presumption can be overcome. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir.2004). In particular, the Ninth Circuit has stated that "the presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Id.* (emphasis added).

The Court cannot conclude, as a matter of law on this record, that *Smiddy* applies in this case because the record would support a conclusion that Det. Bravo "knowingly provide[d] misinformation" to Rodriguez. By Det. Bravo's own testimony it is clear that he gave Rodriguez his search warrant affidavit and his January 11th supplemental report, each containing the material misstatements and omissions already discussed above. Det. Bravo argues against this outcome by offering a statement from Rodriguez asserting that even if he had had all of the information left out of Det. Bravo's reports, he would still have charged Plaintiff. (Rodriguez Decl. ¶ 8).

other [deputies], served the search warrant on plaintiff's residence. Plaintiff was arrested and I accompanied him to Century Station."]; Ramirez Decl. ¶ 8 ["When I went to the door,

there were many screaming police officers aiming their guns at my head, I was arrested."]).

However, this hindsight testimony is of little value given that the file containing all of Rodriguez's case materials was lost, he could remember little about the case or the charging decision during his deposition taken six months *before* the declaration was completed (*compare* Plf. Ex. 10 [Rodriguez Depo.] at 123 *with* Df. Ex. I [Rodriguez Decl.] at 91), and that Rodriguez is employed by one of Defendants.[8] *See Awabdy*, 368 F.3d at 1068 ("Awabdy may be able to prove that the defendants' knowingly false accusations and other similarly conspiratorial conduct were instrumental in causing the filing and prosecution of the criminal proceedings.").

### d. Malicious Prosecution

 Defendants also move for summary judgment on Plaintiff's malicious prosecution claim. "In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff must show that the defendants prosecuted [him] with *malice* and *without probable cause,* and that they did so for the *purpose of denying [him]* equal protection or another specific *constitutional right.* Malicious prosecution actions are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed." *Awabdy*, 368 F.3d at 1066 (internal citations and quotations omitted, emphasis added but alterations in original). In this case, "malicious prosecution" is somewhat a misnomer because the Constitutional basis of the claim is the ongoing unlawful seizure—a violation of the Fourth Amendment—which was set in motion by Det. Bravo when he arrested Ramirez, arguably without probable cause.

 Material questions of fact exist precluding summary judgment on this claim. On probable cause to prosecute, Defendants re-assert the argument put forth in the previous section regarding the presumption of probable cause after an independent decision by prosecutors to charge a defendant with a crime. (Mot. at 16–17). For the reasons set forth in that section, the Court concludes that material issues of fact exist as to whether Det. Bravo subverted the judicial process by providing falsified information to the prosecution. Moreover, with respect to any contention that the preliminary hearing either defeats or mitigates the damages flowing from Det. Bravo's alleged violation of Ramirez's constitutional rights, *Awabdy* spoke directly to that issue:

In California, as in virtually every other jurisdiction, it is a long-standing principle of common law that a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes prima facie-but not conclusive-evidence of probable cause. Awabdy contends that the district court erred because it did not afford him an opportunity to rebut, or overcome, the prima facie finding. We agree. Among the ways that a plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith. Accordingly, the Superior Court's decision to hold Awabdy to answer after a preliminary hearing would not prevent him from maintaining his § 1983 malicious prosecution claim if he is able to prove the allegations in his complaint that the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct.

---

8. In addition, the Court notes that Rodriguez also testified at deposition that "[i]f the victim had been uncertain about her ID, yes it would have affected me." (Plf. Ex. 10 [Rodriguez Depo.] at 135:13–14).

*Awabdy v. City of Adelanto*, 368 F.3d at 1068 (9th Cir.2004) (citations omitted). Since the record contains evidence that the criminal prosecution may have been induced by wrongful conduct undertaken in bad faith, the Court concludes that the claims against Det. Bravo cannot be summarily adjudicated in his favor on qualified immunity grounds.

### e. Evidence Claims

Det. Bravo also moves for summary judgment on Plaintiff's two § 1983 claims for fabricating (*Devereaux*) and withholding evidence (*Brady*). (Mot. at 19).

#### i. Deliberate Fabrication of Evidence

■■■■ "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir.2001). To make out a claim for deliberate fabrication of evidence, Plaintiff must show at least one of the following two propositions: (1) Defendants continued their investigation of [Plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. *Id.* at 1076.

■■■■ Plaintiff claims only the first prong[9] stating that "Bravo and the LASD not only continued, but *began*, their investigation of Raul, despite the fact that they knew or should have known that he was innocent." (Opp. at 29). He may, however, have a claim under the second prong.

The record contains evidence, for example, that Det. Bravo manipulated the identification process before the victim selected a photograph of her assailant, that he manipulated it after the identification by confirming that the person selected was the driver of the blue Honda she had observed, and that, after he observed a mole on Ramirez's face, he falsely reported that the victim had earlier described a mole on the face of her assailant. The record also contains evidence that he ignored and concealed evidence inconsistent with the eyewitness's supposed unequivocal identification of Ramirez as her assailant. Without more, this would be enough to establish a *Devereaux* violation. Since the Constitutional right described in *Devereaux* has previously been determined in this circuit to be clearly established, Det. Bravo's motion for qualified immunity as to this claim must be denied.

#### ii. Brady

■■■■ Plaintiff also claims that his constitutional rights were violated by Det. Bravo's withholding of exculpatory evidence during the criminal case. "The government violates its constitutional duty to disclose material exculpatory evidence where (1) the evidence in question is favorable to the accused in that it is exculpatory or impeachment evidence, (2) the government willfully or inadvertently suppresses this evidence, and (3) prejudice ensues from the suppression (i.e., the evidence is 'material'). Evidence is material for *Brady* purposes if there is a reasonable probability that, ***had the evidence been dis-***

---

9. Plaintiff does discuss "coercive behavior of law-enforcement officers in pursuit of a confession" (Opp. at 30), but fails to link that discussion to any particular evidence obtained from Plaintiff's interrogation. Accordingly, this discussion does not state a claim under *Devereaux*, 263 F.3d at 1078 ("Because this coercive technique did not, on Dever- eaux's theory of the facts, yield any false testimony even though it was applied to an especially vulnerable witness, it can hardly serve as a basis for a claim that Defendants violated Devereaux's rights by using techniques that they knew or should have known would yield false information.").

*closed to the defense, the result of the proceeding would have been different."* Silva v. Brown, 416 F.3d 980, 985 (9th Cir.2005)(internal citations and quotations omitted)(emphasis added).

■ The problem with Plaintiff's independent *Brady* claim is that he actually received all of the evidence before trial, was found not guilty of the crime and was ultimately adjudged factually innocent. Therefore, he cannot show that he would have obtained a better result at trial had the information been disclosed sooner. However, even though the Court concludes that Ramirez cannot maintain a separate claim for the alleged *Brady* violation, evidence that Det. Bravo concealed exculpatory information from the prosecutor bears directly on the malicious prosecution/illegal seizure claim discussed above, and will be admitted for that purpose at trial.

### f. Failure to Adequately Protect Plaintiff While Incarcerated as Required by the Eighth Amendment

■ Plaintiff's last alleged constitutional violation against Det. Bravo asserts that Det. Bravo violated his duty to protect Plaintiff from attacks by other inmates while incarcerated, as required by *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Defendants seek qualified immunity on this claim as well.

In *Farmer*, the Supreme Court recognized that under the Eighth Amendment "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." 511 U.S. at 833, 114 S.Ct. 1970. "[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, 'sufficiently serious' . . . [and] second . . . 'only the unnecessary and wanton infliction of

pain implicates the Eighth Amendment.'" *Id.* at 834, 114 S.Ct. 1970.

Plaintiff claims that a deprivation occurred when Det. Bravo failed to inform the inmate reception center at the jail upon Plaintiff's initial intake of Plaintiff's status as an immediate family member of a law enforcement officer, so that he could be segregated from the general prison population. (Opp. at 34). Even assuming that Det. Bravo had a duty to provide this information to officers at the county jail, such a duty has not been clearly established in the law of this circuit. Second, the evidence before the Court fails to establish this constitutes a "sufficiently serious" deprivation, viewed objectively, since Ramirez was already segregated from the general population due to the nature of the charges against him. Finally, Plaintiff has failed to make an argument, let alone offer evidence, regarding the requirement that an Eighth Amendment violation involves the "unnecessary and wanton infliction of pain." Accordingly, the motion as to the Eighth Amendment violation must be **GRANTED.**

### 3. The *Monell* Claim

The County moves for summary judgment on Plaintiff's *Monell* cause of action, alleging that the County of Los Angeles is responsible for any constitutional violations by its sheriff's deputies. Local governments are considered to be "persons" subject to liability under § 1983 when official policy or custom brings about a constitutional injury. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While local governments may not be found liable for the actions of their employees on a *respondeat superior* theory, if a constitutional violation is proven to result from a local government's official policy, practice, or custom, that government or governmental

**1228**

entity may be held liable. *See, e.g., Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ As evidence of policy or custom, Plaintiff points out that an "LASD designee on the subject of LASD's policies has testified that he knows of no LASD employee who has been disciplined, over a 29–year period, for failing to turn over exculpatory material or for excluding information from a report.... Such failures, standing alone, establish the LASD and COLA customs, policies, and practices with respect to these violations." (Opp. at 31). In a footnote, Plaintiff also points to the fact that "Defendants identified at least 13 cases over two years where a civil rights plaintiff claiming to have been falsely arrested had also been declared factually innocent." (Opp. at 31 n.13). Neither point, however, establishes a custom, practice or policy of constitutional violations. As to the first point, Plaintiff does not provide evidence regarding the number, if any, of allegations of such failures, the response to the allegations, and the reasons why, in any particular case, no discipline was imposed. Thus, the Court cannot accept Plaintiff's assertion that the witness's statement "standing alone" establishes a basis for *Monell* liability. Likewise, the contention that in 13 cases, out of the tens of thousands handled by the Sheriff's Department, a defendant was found factually innocent does not prove that there was any civil rights violation in those cases, let alone prove the content of the unlawful custom, policy or practice.

■ Finally, Plaintiff asserts that his rights were violated as a result of LASD and COLA's failure to train LASD personnel with respect to constitutional rights. As evidence, he offers only that Det. Bravo admitted that he has had no training with respect to *Brady* violations. However, "[p]roof of a single incident of unconstitu-

tional activity is not sufficient to impose liability under *Monell.*" *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Accordingly, Plaintiff has failed to create a triable issue of fact on his *Monell* claim.

**C. State Law Claims**

**1. False Imprisonment**

Because an element of Plaintiff's state law false imprisonment claim requires the imprisonment to have been made without lawful privilege, the claim rises and falls with Plaintiff's § 1983 false arrest claim and must go to the jury along with it. *See Easton v. Sutter Coast Hosp.,* 80 Cal. App.4th 485, 496, 95 Cal.Rptr.2d 316 (2000)(listing the elements of a false imprisonment claim as (1) the nonconsensual, intentional confinement of a person, (2) *without lawful privilege,* (3) for an appreciable period of time); *see also Collins v. City & County of San Francisco,* 50 Cal. App.3d 671, 673, 123 Cal.Rptr. 525 (1975)(stating that " 'false arrest' and 'false imprisonment' are not separate torts. False arrest is but one way of committing a false imprisonment, and they are distinguishable only in terminology."). Having concluded that Plaintiff has established genuine issues of material fact on his Fourth Amendment illegal seizure claim, the false imprisonment claim survives summary judgment.

**2. Cal. Civil Code Section 52.1**

Defendants move for summary judgment on Plaintiff's claim under California Civil Code § 52.1, which alleges that Det. Bravo "interfered, and attempted to interfere, by threats, intimidation and coercion, with the exercise and enjoyment of Plaintiff's constitutional and statutory rights." (Compl. ¶ 90). Det. Bravo contends that this claim fails for two reasons. First, Det. Bravo's alleged threat did not cause an interference with Plaintiff's constitu-

tional rights, and second, Plaintiff failed to file a timely tort claim with the County. (Mot. at 22).

### a. Det. Bravo's Alleged Threat

 Det. Bravo contends that even if he threatened Plaintiff, those threats are not actionable because there was no resulting interference with Plaintiff's constitutional rights. However, § 52.1 protects not only against *actual* interference with constitutional rights, but also against *attempted* interference. *See* Cal. Civ.Code § 52.1 ("If a person ... interferes by threats, intimidation, or coercion, or *attempts* to interfere by threats, intimidation, or coercion ....")(emphasis added). Therefore, Det. Bravo's alleged attempts to force Plaintiff to abandon his right against self incrimination by confession meets this standard.

### b. Timeliness of Plaintiff's Tort Claim

 Det. Bravo's second argument is that Plaintiff's claim is time-barred. California Government Code § 905 requires that a tort claim be filed prior to the filing of a state law claim, including any action under § 52.1, against a public entity. The time-frame for this filing is within six months of the incident. Cal. Gov.Code § 911.2. As Det. Bravo made the supposed threats against Plaintiff during his interrogation of Plaintiff on January 10, 2003, Plaintiff was required to file a claim by June 10, 2003, and not January 8, 2004 when he did. Thus, the claim is untimely.

Plaintiff acknowledges the timing problem, but contends that Det. Bravo should be estopped from asserting such a defense because Det. Bravo deterred him from filing a timely claim. (Opp. at 32). Specifically, Plaintiff claims that Det. Bravo should be estopped from asserting his limitations defense because he "threatened and Intimidated Raul while he was in LASD custody [and he] took these threats

seriously." (Opp. at 33). The Court agrees.

 An "estoppel [defense] is available in all circumstances where the government has acted in an unconscionable manner or attempted to take unfair advantage of the claimant. The issue is determined from the totality of the circumstances." *Christopher P. v. Mojave Unified Sch. Dist.*, 19 Cal.App.4th 165, 172, 23 Cal.Rptr.2d 353 (1993). Where threats or intimidation are the basis of an estoppel claim, courts consider "(1) whether any threats were in fact made ..., (2) when the effect of any such threats ceased, and (3) whether plaintiff acted within a reasonable time after the coercive effect of the threats had ended." *Id.* at 171, 23 Cal.Rptr.2d 353.

It is undisputed that Det. Bravo attempted to get Plaintiff to confess by telling him he would make a good target in jail and that Det. Bravo would look at Plaintiff's police-officer brother as a suspect. (RSGI ¶¶ 178–80). Plaintiff claims that the effects of those threats did not cease until after his release from custody in·November 2003 because Det. Bravo had initially failed in his duty to have Plaintiff placed in protective custody reserved for family of law enforcement, and after Plaintiff was incarcerated filed an internal investigation report against his brother. (*Id.*). Under such undisputed circumstances, the Court concludes that Det. Bravo's threats of influence over Plaintiff were enough to show that Det. Bravo took unfair advantage of Plaintiff, preventing him from filing a claim based on Det. Bravo's behavior. Accordingly, equity demands that Defendants be estopped from asserting the limitations defense.

## IV.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

(1) The motion for summary judgment on the false arrest, illegal search, and "malicious prosecution" claims, all of which arise under the Fourth Amendment to the United States Constitution, is **DENIED**.

(2) The motion for summary judgment on the Fourteenth Amendment claim for deliberate falsification of evidence (*Devereaux* claim) is **DENIED**.

(3) The motion for summary judgment on the related state law claims of false imprisonment and violation of Civil Code Section 52.1 is **DENIED**.

(4) The motion for summary judgment on the Fourteenth Amendment claim for failure to disclose exculpatory evidence is **GRANTED**.

(5) The motion for summary judgment on the *Monell* claim against the County of Los Angeles is **GRANTED**.

Plaintiff has asked the Court for a *Chuman* certification, ordering any potential appeal of the denial of qualified immunity issue as frivolous, should the Court deny immunity. *See Chuman v. Wright,* 960 F.2d 104 (9th Cir.1992). In this case, the Court concludes that such an appeal would be frivolous. The Constitutional rights in dispute have been clearly established. Moreover, the evidence in the record, viewed in a light most favorable to the party claiming injury, establishes at the very least that genuine issues of material fact remain as to whether those clearly established rights have in fact been violated. An appeal on the issue would do nothing but unreasonably delay the time when Ramirez gets his day in Court.

IT IS SO ORDERED.